*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 17-CF-0544 & 20-CO-0058

WILLIAM DONNETTE SANDERS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court of the
District of Columbia
(2016-CF2-000643)

(Hon. Juliet J. McKenna, Motions Judge & Hon. Lynn Leibovitz, Trial Judge)

(Argued February 23, 2023     Decided February 6, 2025)

*Thomas T. Heslep* for appellant.

*Mark Hobel*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb* and *Nicholas P. Coleman*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and MCLEESE,[1] *Associate Judges*.

---

[1] Associate Judge AliKhan was originally assigned to this case. Following Judge AliKhan's appointment to the U.S. District Court for the District of Columbia, effective December 12, 2023, Associate Judge McLeese was assigned to take her place on the panel.

BLACKBURNE-RIGSBY, *Chief Judge*: In this consolidated matter, William Donnette Sanders appeals his convictions for numerous possessory offenses and the trial court's denial of his post-conviction motion alleging ineffective assistance of counsel under D.C. Code § 23-110. Following a jury trial, Mr. Sanders was convicted of nine possessory offenses related to drugs, a gun, and other paraphernalia found in his car. At trial, the government argued that Mr. Sanders constructively possessed the items found in his car. On appeal, Mr. Sanders challenges the trial court's denial of his motion to suppress statements he made to the police, which he contends were obtained in violation of his *Miranda* rights.[2] Mr. Sanders also challenges the trial court's denial of his Section 23-110 motion, in which he alleges that his trial counsel was ineffective for failing to file a motion to suppress evidence obtained from a search of his person. Lastly, Mr. Sanders challenges the trial court's denial of his motion for judgment of acquittal, claiming that the government's evidence was insufficient to support a finding of constructive possession.

We affirm Mr. Sanders's convictions and the trial court's denial of his Section 23-110 motion.

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

## I.      Factual Background & Procedural History

On December 12, 2015, Mr. Sanders was visiting Darnell Stanley when members of the Metropolitan Police Department arrived to execute a search warrant of Mr. Stanley's apartment, located at 308 34th Street in Southeast Washington, D.C.  Upon arrival, the police noticed Mr. Sanders standing outside of Mr. Stanley's apartment with the door open.  As the police approached the building, Mr. Stanley and Mr. Sanders began to descend the stairs outside of the apartment.  Neither attempted to flee, but the police stopped both individuals.  The police then entered Mr. Stanley's apartment and secured the location before bringing Mr. Sanders and Mr. Stanley back inside the apartment.

Once inside, the police asked Mr. Sanders several questions, including what he was doing at the apartment and how he arrived there.  Mr. Sanders answered that he was visiting a friend and that he had driven himself there.  The police then asked Mr. Sanders about the type of car that he drove.  In response, Mr. Sanders identified a Chrysler that was parked in front of the building.  The police searched Mr. Sanders's person during their execution of the search warrant for the apartment, finding a key fob and about $1,000.  After recovering the key fob, Officer Qasim Thomas—one of the police officers executing the search warrant of Mr. Stanley's apartment—went outside and pushed the panic button on the key fob, which set off

the alarm on a car located directly outside of Mr. Stanley's apartment building. The police later determined that the car was registered to Mr. Sanders.

Officer Thomas returned to the apartment to continue executing the search warrant with the other officers, during which they found evidence of contraband. At this time, the officers radioed for a K9 unit to assist them with a walk around of Mr. Sanders's car. According to Officer Thomas, the police decided to call in a K9 unit to "make sure [they] were covering all bases" because they noticed that Mr. Sanders had a "blank look in his face" while the officers were discovering contraband in the apartment, which Officer Thomas thought "seemed a little odd." The K9 officer deployed a dog that assisted the police with a walk around of Mr. Sanders's car. The dog indicated the presence of a firearm or firearm-related material in the trunk of the car. The police then towed the car to the police lot, released Mr. Sanders due to a lack of sufficient evidence to arrest him, and obtained a search warrant for his car.

The police searched the car[3] and found the following in the trunk: a backpack containing a freezer bag with 473 grams of marijuana; a plastic bag with 7.6 grams of cocaine in rock form; a box of sandwich bags; a Colt MK IV .45 caliber handgun

---

[3] The police did not observe Mr. Sanders interacting with the car or any of its contents prior to the search.

loaded with sixteen .45 caliber rounds in a drum magazine (capable of holding forty bullets) with one round in the chamber; a black plastic bag containing smaller Ziploc bags under the spare tire; adult male clothing and shoes; and other miscellaneous items. The search of the vehicle also produced the following evidence: mail matter in the name of William Sanders located in the rear armrest between the two passenger seats; a digital scale located in the rear armrest between the two passenger seats; a pill bottle in the name of William Sanders; mail matter in the name of Sharon Sanders in the front armrest; and a box of Ziplock bags at the bottom of the floorboard of the passenger seat.

Prior to trial, Mr. Sanders filed a motion to suppress pursuant to the Fourth and Fifth Amendments, seeking suppression of all tangible evidence seized from him, the statements he made to the police, and "any other fruits of the foregoing."[4] Mr. Sanders argued that his Fourth Amendment rights were violated when the police initially approached and detained him because they did not observe him engaging in any wrongdoing. As a result, according to Mr. Sanders, the trial court was required to suppress all fruits of that seizure. With respect to his Fifth Amendment rights, Mr. Sanders argued that he was subject to custodial interrogation when he made

---

[4] Mr. Sanders's trial counsel did not explicitly pursue an argument that the items obtained from the search of Mr. Sanders's person—the key fob and $1,000—should be suppressed.

statements to the police about his car because he was detained when he made the statements and the questioning focused on his connection to the apartment. The trial court denied the motion, concluding that there were no constitutional violations because, among other things, (1) Mr. Sanders was standing outside of an apartment that was subject to the execution of a search warrant, (2) the police questioned Mr. Sanders to ensure their own safety rather than to elicit incriminating statements, (3) his detention was not unduly prolonged, and (4) the police had probable cause to search Mr. Sanders's car in light of the K9 unit's investigation.

While Mr. Sanders's direct appeal was pending, he filed a motion pursuant to D.C. Code § 23-110, alleging ineffective assistance of counsel. Mr. Sanders claims that his trial counsel was deficient because the key fob and $1,000 should have been suppressed pursuant to the Fourth Amendment as fruits of an illegal search and his trial counsel failed to specifically seek suppression of those items. He contends he was prejudiced by this allegedly deficient performance because, without the key fob and $1,000 obtained from his person during the search, there would have been less evidence linking Mr. Sanders to the contraband found in his car. The trial court denied the motion by written order without holding an evidentiary hearing, concluding that Mr. Sanders's trial counsel did not act deficiently because he filed a motion to suppress, the search was lawful, and the discovery of the evidence at issue

was inevitable.[5] Mr. Sanders timely appealed the trial court's denial of his Section 23-110 motion.

As part of its case-in-chief at trial, the government called Mr. Stanley as a witness. At this time, Mr. Stanley was incarcerated for gun and drug charges stemming from the execution of the search warrant on his apartment. The government compelled Mr. Stanley's testimony by providing him use immunity and called him as an adverse witness.[6] Contrary to the government's theory that the firearm, drugs, and related paraphernalia belonged to Mr. Sanders, Mr. Stanley testified that they belonged to him. Mr. Stanley explained that he had borrowed Mr. Sanders's car that day to run some errands with his son. Then, without informing Mr. Sanders, he procured drugs from his supplier and made several drug sales from the car.

---

[5] The trial court also concluded that the motion was procedurally barred because the matter was not raised in Mr. Sanders's direct appeal. We do not consider whether the motion was procedurally barred because the government does not rely on this ruling, as it notes that Mr. Sanders filed his claim during the pendency of his direct appeal.

[6] Mr. Sanders objected to the government calling Mr. Stanley as a witness, arguing that it was doing so solely for the purposes of impeachment. The trial court allowed the government to present Mr. Stanley as a witness, ruling that Mr. Stanley corroborated various material facts related to the government's case.

At trial, the government impeached Mr. Stanley based on various aspects of his testimony, including his characterization of his prior relationship with Mr. Sanders as "pretty good, decent" and the inconsistency between his testimony that Mr. Sanders's car had a push-to-start ignition and his pretrial statement to the government that the car had a traditional key ignition. Mr. Stanley made other inconsistent statements at trial, including a description of the firearm that was inconsistent with the firearm the police recovered from Mr. Sanders's car and an assertion that he previously borrowed Mr. Sanders's car to purchase the baggies and forgot he had left them under the spare tire, which was inconsistent with his earlier testimony that he did not bring any baggies into the car. Further, Mr. Stanley acknowledged that he told the government prior to trial that he made loose drug sales, which was inconsistent with the presence of baggies in the car. The government also elicited a concession from Mr. Stanley that he and Mr. Sanders were housed together at the D.C. Jail and that, during this time, he saw at least one picture of the backpack with the drugs and pistol from Mr. Sanders's trunk.

At the conclusion of the government witnesses' testimony, the parties read stipulations into the record, including that the "digital scale and ammunition" recovered from Mr. Sanders's car "were not swabbed for DNA"; "no conclusions could be drawn about the identity of the DNA on the gun swabs[,] . . . gun magazine[,] . . . [or] plastic baggies"; "[n]o fingerprints were recovered from the

gun, gun magazine, ammunition, or plastic baggies"; "Mr. Sanders did not have a license to carry or a registration to possess a gun or ammunition on December 12, 2015 in the District of Columbia"; "Mr. Sanders is the registered owner of a 2015 black four-door Chrysler 300[,] license plate number 8BX1288"; and "Mr. Sanders had a prior conviction the penalty of imprisonment for which was greater than one year." The jury deliberated and returned a guilty verdict on all counts.[7] Mr. Sanders was sentenced to an aggregate term of seventy-two months of imprisonment with five years of supervised release. Mr. Sanders timely noted his appeal.

## II. Discussion

### A. *Miranda* Violation

In his motion to suppress, Mr. Sanders challenged the admission of statements he made to the police during the execution of the search warrant at Mr. Stanley's

---

[7] Mr. Sanders was convicted of the following charges: unlawful possession with intent to distribute ("PWID") cocaine (D.C. Code § 48-904.01(a)(1)); PWID marijuana (D.C. Code § 48-904.01(a)(1)); two counts of possession of a firearm during a crime of violence or dangerous offense (D.C. Code § 22-4504(b)); unlawful possession of a firearm (D.C. Code § 22-4503(a)(1), (b)(1)); possession of an unregistered firearm (D.C. Code § 7-2502.01(a)); unlawful possession of ammunition (D.C. Code § 7-2506.01(3)); possession of a large-capacity ammunition feeding device (D.C. Code § 7-2506.01(b)); and unlawful possession of drug paraphernalia (D.C. Code § 48-1103(a)).

apartment.[8]  The trial court denied Mr. Sanders's motion to suppress, concluding that there was no *Miranda* violation because (1) Mr. Sanders was free to leave Mr. Stanley's apartment, and (2) the police questioned him to protect their own safety rather than to elicit incriminating statements.

### 1.    Analysis

On appeal, Mr. Sanders argues that his statements to the police should have been suppressed because he was in custody when he was handcuffed and questioned by police without being given his *Miranda* warnings.  The government contends that Mr. Sanders was not in custody or interrogated under *Miranda*.  Rather, according to the government, Mr. Sanders was temporarily detained while the police executed a search warrant, with the brief questioning aimed at ensuring the officers' safety rather than eliciting incriminating responses.

---

[8] In his written motion, Mr. Sanders challenged the admission of statements he made in an interview with the police, arguing that he was subject to custodial interrogation during the interview.  Although his written motion refers only to the fact that Mr. Sanders was in custody and gave statements to the police, Mr. Sanders clarified during a subsequent motions hearing that his challenge extended to the statements he made to officers while he was detained and handcuffed in Mr. Stanley's apartment during the execution of the search warrant.  On appeal, Mr. Sanders challenges the constitutionality of only the statements he made during the execution of the search warrant.  He does not challenge the statements he made during his interview with the police, which were not introduced into evidence at trial.  We therefore limit our review to the statements he made during the execution of the search warrant.

When reviewing a denial of a motion to suppress on *Miranda* grounds, we defer to the trial court's findings of fact unless they are clearly erroneous and view the facts and any reasonable inferences in the light most favorable to the court's ruling. *(Adrienne) Johnson v. United States*, 207 A.3d 606, 611 (D.C. 2019) (citing *(Elton) Jones v. United States*, 779 A.2d 277, 281 (D.C. 2001) (en banc)); *see Morton v. United States*, 125 A.3d 683, 686 (D.C. 2015) (citing *Griffin v. United States*, 878 A.2d 1195, 1198 (D.C. 2005)). All legal conclusions, including whether an individual was in custody or subject to interrogation, are reviewed de novo. *Morton*, 125 A.3d at 686.

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), the government is precluded from introducing into evidence any statements elicited during a custodial interrogation unless the individual who made the statements was first given warnings about their constitutional rights. *Id.* at 467-71. *Miranda* warnings are therefore required when the individual is both (1) in custody, and (2) subject to interrogation. *(Elton) Jones*, 779 A.2d at 280. We hold that the trial court erred in denying Mr. Sanders's motion to suppress because he was subjected to custodial interrogation when he made statements to the police in Mr. Stanley's apartment without receiving *Miranda* warnings. Nonetheless, we conclude that the error was harmless because (1) there is no reasonable possibility that the introduction of the

statements contributed to Mr. Sanders's conviction, and (2) the contraband is not subject to exclusion as the fruit of his un-Mirandized statements.

### i.    Custody

To determine whether a person is in custody for *Miranda* purposes, this court examines "the totality of the circumstances of the interrogation" and determines whether a reasonable person in those circumstances would have felt they were "in police custody of the degree associated with formal arrest." *(Adrienne) Johnson*, 207 A.3d at 611 (internal quotation marks omitted); *see also Broom v. United States*, 118 A.3d 207, 212 (D.C. 2015) (citing *Howes v. Fields*, 565 U.S. 499, 508-09 (2012)). The fact that an individual has been detained by police is not, by itself, sufficient to support a finding of custody under *Miranda*. *Morton*, 125 A.3d at 687. Instead, the court must apply an objective test to determine whether there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (internal quotation marks omitted). "Whether the curtailment of freedom rises to that level is to be assessed by reference to how a reasonable man or woman in the suspect's position would have understood his or her situation." *(Adrienne) Johnson*, 207 A.3d at 610-11 (quoting *Morales v. United States*, 866 A.2d 67, 71 (D.C. 2005)). Although "the task of defining 'custody' is a slippery

one" and "there is no checklist" in making this determination, this court considers many factors, including:

> the degree to which police physically restrain the suspect—including whether police use handcuffs; [c]ommunications from the police to the suspect, and particularly, whether the police have informed the suspect that he is not under arrest and that he may decline to answer questions; whether interrogation occurs in public or in a secluded area; the length of the detention and questioning; whether the police questioning is inquisitorial or accusatory; the show of force or brandishing of weapons by the police; and whether the suspect is confronted with obvious evidence of [his] guilt or the police already have sufficient cause to arrest, and this is known to the suspect.

*Morton*, 125 A.3d at 687, 688 (internal quotation marks and citations omitted). The relevant inquiry, then, is whether a reasonable person in Mr. Sanders's position would have felt they were subject to a restraint on their movement to the degree associated with a formal arrest. *See id.* at 687.

The government contends that Mr. Sanders was not in custody because he was detained only temporarily incident to the execution of a search warrant. Such detention, according to the government, is analogous to a *Terry* stop[9] and does not amount to custody under *Miranda*. This court, however, has held that "[t]he fact

---

[9] A *Terry* stop "involves a . . . temporary detention, designed to last only until a preliminary investigation either generates probable cause or results in the release of the suspect." *In re M.E.B.*, 638 A.2d 1123, 1126 (D.C. 1993); *see Terry v. Ohio*, 392 U.S. 1 (1968).

that an encounter may be a reasonable seizure within the scope of *Terry* for Fourth Amendment purposes does not automatically and necessarily remove it from *Miranda*'s Fifth Amendment protections." *Morton*, 125 A.3d at 688 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). Further, an individual may be in custody even if they have not been formally arrested. *(Marquette) White v. United States*, 68 A.3d 271, 284 (D.C. 2013) (citing *In re D.W.*, 989 A.2d 196, 201 (D.C. 2010)).

Here, we determine that Mr. Sanders was in *Miranda* custody because a reasonable person in his situation would have felt they were subject to a restraint on their movement to the degree associated with a formal arrest. *See (Adrienne) Johnson*, 207 A.3d at 611. Critically, Mr. Sanders was in handcuffs for the duration of his detention, including when he made statements to the police about the location and make of his car. Although not dispositive, the fact that the police handcuffed Mr. Sanders "strongly militates toward a finding of *Miranda* custody." *Morton*, 125 A.3d at 689; *see also (Marquette) White*, 68 A.3d at 279 (noting that "[h]andcuffing does not necessarily transform an investigative detention into an arrest, but it is recognized as a hallmark of a formal arrest") (internal quotation marks omitted). It is significant that "neither this court nor the Supreme Court has published an opinion in which it determined that a suspect in handcuffs was not in *Miranda* custody." *(Marquette) White*, 68 A.3d at 279.

Although "handcuffing does not end the inquiry" and "must be considered in context of the totality of the circumstances," *Morton*, 125 A.3d at 689, there are several other factors that compel a finding of *Miranda* custody in this case. The police not only handcuffed Mr. Sanders, but they failed to inform him that he was not under arrest and that he could decline to answer their questions. *See In re I.J.*, 906 A.2d 249, 260 (D.C. 2006) ("Communications from the police to the suspect, in particular, may assuage the reasonable person's assessment of the situation, and militate against a finding of custody."). The nature of the interrogation also weighs in favor of a finding of *Miranda* custody. The questioning of Mr. Sanders occurred after the police moved Mr. Sanders from the steps of the building into Mr. Stanley's apartment, a more secluded setting and one in which a reasonable person is more likely to feel that their freedom of movement has been restrained to a degree associated with a formal arrest. *See Morton*, 125 A.3d at 688. Additionally, the police questioned Mr. Sanders about how he arrived at Mr. Stanley's apartment and what car he drove. These sorts of probing questions, which were seemingly not directly related to the execution of the search warrant or the officers' safety, would indicate to a reasonable person that the police suspected their involvement in the alleged criminal activity being investigated. *See (Marquette) White*, 68 A.3d at 281.

To be sure, certain factors weigh against a determination that Mr. Sanders was in *Miranda* custody. For example, the questioning by police "was not as coercive

as, for example, confronting a suspect with a bag of illegal drugs." *Id.* at 281 n.22 (citing *United States v. Revels*, 510 F.3d 1269, 1276 (10th Cir. 2007)). Additionally, the length of the detention was tied to the time it took to execute the search warrant, which was, arguably, temporary and brief.[10] *See Morton*, 125 A.3d at 688. Moreover, the police did not confront Mr. Sanders with obvious evidence of his guilt or brandish any weapons. *See id.* When looking at the totality of the circumstances, however, we conclude that a reasonable person would have felt they were subject to a restraint on their movement to the degree associated with a formal arrest. The police did not simply handcuff Mr. Sanders; they failed to inform him that he was not under arrest, moved him into a secluded area, and asked questions that implied he was related to the criminal activity they were investigating. We therefore determine that Mr. Sanders was in custody for the purposes of *Miranda* when he provided statements to the police regarding the location and make of his car.

### ii. Interrogation

Under *Miranda*, interrogation refers "to express questioning . . . [and] any words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an

---

[10] We note, however, that Mr. Sanders was detained while the police dog sniffed his car, which was not directly related to the execution of the search warrant and extended the time during which Mr. Sanders was in custody.

incriminating response from the suspect." *(Elton) Jones*, 779 A.2d at 282 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Not all questions that a police officer might ask a detainee during a *Terry* stop will fall within the scope of *Miranda* interrogation. *Compare id.* at 283 (stating that questions such as "what is your name" and "where do you live" do not usually constitute interrogation under *Miranda*) *with Miley v. United States*, 477 A.2d 720, 723-24 (D.C. 1984) (holding that an officer's probing questions, which went to the heart of the offense under investigation, exceeded the scope of general exploratory inquiries associated with an investigatory stop). Nonetheless, any police questioning during a *Terry* stop that is reasonably likely to elicit an incriminating response constitutes interrogation under *Miranda*. *See (Elton) Jones*, 779 A.2d at 282-83.

Here, we conclude that the police's questioning of Mr. Sanders was reasonably likely to elicit an incriminating response. In asking Mr. Sanders how he arrived at Mr. Stanley's apartment and what car he drove, the officers engaged in questioning that was reasonably calculated to enable them to identify and locate a place—Mr. Sanders's vehicle—that they apparently wanted to investigate for possible evidence of a crime. The police thus engaged in questioning that was reasonably likely to elicit a response that would aid the police in investigating evidence of possible criminal conduct carried out by Mr. Sanders. Accordingly, we

conclude that Mr. Sanders was subject to interrogation under *Miranda*. *See id.* at 282.

Because Mr. Sanders made statements about the location and make of his car while subject to custodial interrogation, we hold that the trial court erred in denying Mr. Sanders's motion to suppress those statements.

### iii. The Trial Court's Error Was Harmless

Notwithstanding the trial court's error in denying Mr. Sanders's motion to suppress, we determine that the trial court's error was harmless. "In determining whether the admission of a statement obtained in violation of *Miranda* is harmless, we examine whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Dancy v. United States*, 745 A.2d 259, 273 (D.C. 2000) (internal quotation marks omitted) (holding that introduction of statement obtained in violation of *Miranda* was harmless when the statement did not expressly implicate the appellant in the crimes and "there was compelling evidence of [the appellant's] involvement in the crimes apart from his statement to" the police).

Here, there was strong evidence connecting Mr. Sanders to the contraband apart from his statements to the police. Had the trial court suppressed Mr. Sanders's

statements to the police, the jury still would have heard, among other incriminating evidence, that Mr. Sanders owned the car in which the contraband was found; Mr. Sanders was in close proximity to his car at a time when the contraband was in his car; Mr. Sanders's personal items were found in the same parts of the car as the contraband; and Mr. Sanders was in possession of the key fob when the contraband was in his car. Mr. Sanders asserts that the contraband should have been suppressed as fruit of the *Miranda* violation, but he is incorrect. We have ruled that "the rule of *Miranda* does not require the suppression of physical evidence obtained by unwarned interrogation conducted in contravention of *Miranda*." *In re A.J.*, 63 A.3d 562, 564 n.1 (D.C. 2013); *see United States v. Patane*, 542 U.S. 630, 636 (2004) ("[T]he *Miranda* rule is a prophylactic [rule] employed to protect against violations of the Self-Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. Accordingly, there is no justification for extending the *Miranda* rule to this context."). As a result, the fact that Mr. Sanders's un-Mirandized statements led the police to discover contraband in his car does not provide a basis to suppress the contraband. Given that the contraband cannot be suppressed under *Miranda*, we conclude that there is no reasonable possibility that the introduction of Mr. Sanders's statements to the police—which connected him to the car but were not facially incriminating—contributed to his conviction. *See Dancy*, 745 A.2d at 273.

For these reasons, we hold that the trial court's error in denying Mr. Sanders's motion to suppress the statements he made to the police while detained inside Mr. Stanley's apartment was harmless.

## B.       Section 23-110 Motion Alleging Ineffective Assistance of Counsel

On appeal, Mr. Sanders argues that the trial court erred in denying his Section 23-110 motion.  He contends that either a motion for a new trial should have been granted on the pleadings or a hearing should have been held to clear up factual details.  We disagree and affirm the trial court's summary denial.

### 1.       Denial of Section 23-110 Motion

This court reviews a trial court's denial of a Section 23-110 motion for ineffective assistance of counsel as a mixed question of law and fact.  *Derrington v. United States*, 681 A.2d 1125, 1132 (D.C. 1996).  We accept the trial court's factual findings unless they lack evidentiary support in the record and review its legal conclusions de novo.  *Id.*  To successfully allege ineffective assistance of counsel, an appellant must satisfy the two-part test set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the appellant must demonstrate that their counsel's performance was "constitutionally deficient" and "fell below an objective standard of reasonableness."  *Otts v. United States*, 952 A.2d 156, 164 (D.C. 2008) (quoting

*Strickland*, 466 U.S. at 688). Second, an appellant must show that they were prejudiced by this deficient performance, such that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Cosio v. United States*, 927 A.2d 1106, 1132 (D.C. 2007) (en banc) (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). "A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.'" *(Christie) Jones v. United States*, 262 A.3d 1114, 1128 (D.C. 2021) (quoting *Strickland*, 446 U.S. at 694). To establish prejudice in the context of trial counsel's failure to successfully litigate a Fourth Amendment claim, the defendant "must . . . demonstrate a reasonable probability that the motion, if properly litigated, would have been granted, and that if the motion had been granted, it is reasonably probable that the trial would have ended in an acquittal." *Campbell v. United States*, 224 A.3d 205, 209 (D.C. 2020) (citing *Turner v. United States*, 116 A.3d 894, 934-35 (D.C. 2015)). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Turner*, 116 A.3d at 934 (quoting *Strickland*, 466 U.S. at 697).

On appeal, Mr. Sanders alleges that his trial counsel's performance was deficient because his trial counsel failed to seek suppression of the key fob and

$1,000, which Mr. Sanders asserts would have been successful pursuant to *Bingman v. United States*, 267 A.3d 1084 (D.C. 2022). In *Bingman*—which was decided five years after Mr. Sanders's trial—we held that a warrant authorizing the search of the premises of a pop-up marijuana party did not authorize a search of the appellant for weapons because there was no indication in the warrant that there were any weapons on the premises, nor did the police have cause to reasonably believe that the appellant was armed. *See* 267 A.3d at 1087-90. According to Mr. Sanders, his trial counsel would have succeeded in seeking suppression of the key fob and $1,000 because, like the search warrant in *Bingman*, the search warrant for Mr. Stanley's apartment was for narcotics and thus did not authorize a pat down for weapons. We conclude that the trial court properly denied Mr. Sanders's Section 23-110 motion because a motion to suppress the key fob and $1,000 would have been unsuccessful. As a result, Mr. Sanders is unable to establish that he was prejudiced by his trial counsel's performance.

Mr. Sanders's argument that his trial counsel would have succeeded in moving to suppress the key fob and $1,000 lacks merit for multiple reasons. First, the authority he relies on—*Bingman*—is distinguishable from this case. In *Bingman*, we held that the police's pat down of an individual during the execution of a search warrant at a marijuana pop-up party was an unreasonable search because "the only illegal activity specified in the warrant was that the location was being used for the

sale and possible consumption of marijuana and related paraphernalia" and "[t]here was no indication in the warrant that the police had any reason, much less probable cause, to believe that there were any weapons on the premises." 267 A.3d at 1087. Here, on the other hand, Mr. Sanders concedes that the search warrant for Mr. Stanley's apartment explicitly authorized a search for firearms.[11] Given that the search warrant in this case explicitly authorized a search for weapons and the search warrant in *Bingman* was limited to drugs, the police would not have violated the Fourth Amendment under *Bingman* by searching Mr. Sanders for weapons. *Id.* Accordingly, *Bingman* does not support Mr. Sanders's argument that a motion to suppress the key fob and $1,000 would have been successful in this case.

Second, we established in *Germany v. United States*, 984 A.2d 1217 (D.C. 2009), that, during the execution of a search warrant for weapons upon a premises, it is constitutionally permissible for police to frisk any individuals present at the premises. *See id.* at 1227. Our holding in *Germany* was based on *Terry v. Ohio* and its progeny. *See id.* at 1222-27. In *Terry*, the Supreme Court established that police officers do not violate the Fourth Amendment's prohibition against unreasonable searches and seizures when they frisk an individual they have detained if they have

---

[11] In his brief, Mr. Sanders asserts that the search warrant for Mr. Stanley's apartment was "solely for drugs, and did not mention guns." At oral argument, however, Mr. Sanders conceded that the search warrant for Mr. Stanley's apartment explicitly authorized a search for firearms.

a reasonable, articulable suspicion that the individual is armed and dangerous. *Terry*, 392 U.S. at 27. In reaching this conclusion, the Supreme Court articulated the relevant inquiry in assessing the reasonableness of a search or seizure as follows: "would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Id.* at 21-22 (internal quotation marks omitted). "To apply this standard, *Terry* compels us to evaluate the totality of the circumstances." *Germany*, 984 A.2d at 1222 (internal quotation marks omitted).

We recognized in *Germany* that, following *Terry*, the Supreme Court had established "a broad right" for police to secure the premises when executing a search warrant for weapons. *Id.* at 1225 (internal quotation marks omitted); *see Michigan v. Summers*, 452 U.S. 692, 702-05 (1981) (stating that the risk of harm to police officers and occupants is minimized if the officers can exercise unquestioned command of the situation); *see also Los Angeles County v. Rettele*, 550 U.S. 609, 613 (2007) ("The deputies, who were searching a house where they believed a suspect might be armed, possessed authority to secure the premises before deciding whether to continue with the search."). Even prior to *Germany*, we had held that, when executing a search warrant for firearms and ammunition within an apartment, a frisk is justified if police reasonably suspect that anyone in the apartment is not a

casual visitor but is instead associated with the drugs and firearms. *See United States v. Owens*, 788 A.2d 570, 577 n.7 (D.C. 2002).

Applying *Germany* to this case, we conclude that it was constitutional for the police to frisk Mr. Sanders for weapons. As the police arrived at Mr. Stanley's apartment to execute a search warrant for drugs and weapons, they saw Mr. Sanders standing outside of the apartment with the door open before he began to walk down the steps and towards the exit of the building with Mr. Stanley. Given that *Germany* established the right of police to frisk any individual present at a premises that is subject to a search warrant for weapons, we conclude that Mr. Sanders has not established "that it is reasonably probable the trial court would have granted a motion to suppress based on this theory." *Turner*, 116 A.3d at 934.

Mr. Sanders's attempt to distinguish this case from *Germany* is unpersuasive. Mr. Sanders argues that *Germany* does not control in this case because the police never saw Mr. Sanders inside of Mr. Stanley's apartment. Although Mr. Sanders correctly identifies this factual distinction from *Germany*, our analysis in *Germany* makes clear that his presence just outside the doorway does not render the search unreasonable as a matter of law. Our holding in *Germany* was based on our conclusion that an individual's presence on the premises subject to a search warrant for firearms and drugs "indicate[s] the individual's association with the illegal

activities." *Germany*, 984 A.2d at 1227. In reaching that conclusion, we noted that, as a general matter, "immediate safety concerns may justify police in stopping, or stopping and frisking, a person based on his association with someone else whom the police reasonably suspect of criminal activity." *Id.* at 1226 (quoting *Trice v. United States*, 849 A.2d 1002, 1006 (D.C. 2004)).

Here, Mr. Sanders was at the door of the subject apartment when police arrived, and he was seen walking with Mr. Stanley, the owner of the subject apartment. Given that we must assess the reasonableness of the search "in light of the totality of circumstances," *id.* at 1222 (citing *Terry*, 392 U.S. at 21), we conclude that it was reasonable for police to frisk Mr. Sanders for weapons because his association with Mr. Stanley and the target apartment—and, therefore, drugs and firearms—was apparent.

Although it was constitutional for the police to frisk Mr. Sanders for weapons, a frisk for weapons is distinct from a generalized search for contraband. *See (Alex) Robinson v. United States*, 76 A.3d 329, 336 (D.C. 2013) ("The self-protective search authorized under *Terry* does not permit a generalized search for contraband." (quoting *Upshur v. United States*, 716 A.2d 981, 984 (D.C. 1998))). Because the police discovered and retained the key fob and $1,000, our rejection of Mr. Sanders's arguments regarding the applicability of *Bingman* and *Germany* does not resolve the

question whether a motion to suppress those items would have been successful. However, even assuming that the police's constitutional frisk of Mr. Sanders for weapons morphed into an unconstitutional search when the police retained and used his key fob to identify his car, we hold that Mr. Sanders was not prejudiced by his trial counsel's failure to seek suppression of the key fob and $1,000 because the police inevitably would have discovered Mr. Sanders's car in light of the statements he made to the police while he was detained, which were not suppressed.

The inevitable-discovery doctrine "shields illegally obtained evidence from [exclusion] if the government can show, by a preponderance of the evidence, that the evidence 'ultimately or inevitably *would* have been discovered by lawful means.'" *(Prince) Jones v. United States*, 168 A.3d 703, 717 (D.C. 2017) (quoting *Gore v. United States*, 145 A.3d 540, 548 (D.C. 2016)). "To avail itself of the inevitable-discovery doctrine, the government must prove (1) that the lawful process which would have ended in the inevitable discovery had commenced before the constitutionally invalid seizure, and (2) that there is 'requisite actuality' that the discovery would have ultimately been made by lawful means." *(Gregory) Smith v. United States*, 283 A.3d 88, 98 (D.C. 2022) (ellipsis omitted) (quoting *(Prince) Jones*, 168 A.3d at 717) (holding government failed to show a "requisite actuality" that police would have discovered drugs found in a hard plastic case inside of appellant's car because the government introduced

no evidence that it would have arrested and searched him regardless of that illegality).

Here, the lawful process leading to the discovery of contraband began when the police arrived to execute a search warrant for Mr. Stanley's apartment. During their lawful detention of Mr. Sanders during their execution of the search warrant, the police questioned Mr. Sanders, who then provided details about the location and make of his vehicle. It was not until the police arrived at Mr. Stanley's apartment to execute the search warrant that they searched Mr. Sanders and discovered the key fob. As a result, even assuming that the police engaged in an unlawful search by retaining and using the key fob to identify Mr. Sanders's car, the police began the lawful process that led to Mr. Sanders identifying the location and make of his car before any unlawful search took place. *See id.* at 98. Given that Mr. Sanders does not challenge the legality of the police's use of a K9 unit to sniff for contraband— which enabled the police to obtain a search warrant for Mr. Sanders's car—there is "requisite actuality" that the police would have discovered the contraband notwithstanding any illegal search of his person. *Id.*

To be sure, the police conducted their questioning of Mr. Sanders in contravention of *Miranda*. Questioning conducted in contravention of *Miranda*, however, does not implicate the Fourth Amendment's prohibition on unreasonable

searches and seizures. *See Patane*, 542 U.S. at 636-37 (ruling that "the *Miranda* rule is a prophylactic employed to protect against violations of the Self–Incrimination Clause [of the Fifth Amendment]. . . . [P]olice do not violate the Constitution (or even the *Miranda* rule, for that matter) by mere failures to warn"). Thus, because the police's questioning of Mr. Sanders was lawful under the Fourth Amendment, it is immaterial for purposes of the inevitable-discovery doctrine that Mr. Sanders made the statements without receiving *Miranda* warnings.

This court has previously held that the inevitable-discovery doctrine applies in cases where police engaged in lawful and unlawful processes in parallel, and "[h]ad the unlawful process not occurred . . . the lawful one would inevitably have produced the same evidentiary result." *(Prince) Jones*, 168 A.3d at 718 (citing *Pinkney v. United States*, 851 A.2d 479, 495 (D.C. 2004); *McFerguson v. United States*, 770 A.2d 66, 74-75 (D.C. 2001); *Hicks v. United States*, 730 A.2d 657, 662 (D.C. 1999)). Unlike in *Jones*, where the inevitable-discovery doctrine did not apply because a lawful process was available to the police but it "never occurred" and the police instead pursued only the unlawful option, *(Prince) Jones*, 168 A.3d at 718, here, the police did in fact engage in the lawful process of detaining and questioning Mr. Sanders as part of their execution of the search warrant, *see Gore*, 145 A.3d at 549 (holding that inevitable-discovery doctrine did not apply because police had not yet, but "could" have, applied for a search warrant before entering the property and

seizing evidence). Accordingly, we conclude that Mr. Sanders was not prejudiced by his trial counsel's performance because a motion to suppress the search of Mr. Sanders's person would have been unsuccessful.

In light of our conclusion that Mr. Sanders failed to demonstrate that he was prejudiced by his trial counsel's performance, it is not necessary to evaluate whether his trial counsel's performance was constitutionally deficient. *See Strickland*, 466 U.S. at 697, 700 ("Failure to make the required showing of *either* deficient performance *or* sufficient prejudice defeats the ineffectiveness claim.") (emphasis added). Accordingly, we affirm the trial court's denial of Mr. Sanders's Section 23-110 motion.

## 2. Evidentiary Hearing

When a defendant files a Section 23-110 motion, the motions court must hold a hearing "[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." D.C. Code § 23-110(c). This court "will affirm the trial court's denial of a [Section] 23-110 motion without a hearing *only if* the claims (1) are palpably incredible; (2) are vague and conclusory; or (3) even if true, do not entitle the movant to relief." *Bellinger v. United States*, 127 A.3d 505, 515 (D.C. 2015) (emphasis added) (quoting *Newman v. United States*, 705 A.2d 246, 261 (D.C. 1997)); *see Shepherd v. United States*, 296 A.3d 389, 392 (D.C. 2023)

(explaining that the statutory hearing requirement is subject to only these three exceptions).  The denial of a request for an evidentiary hearing is reviewed for abuse of discretion and, in upholding the denial, "we must be satisfied that under no circumstances could the [appellant] establish facts warranting relief."  *Barrie v. United States*, 279 A.3d 858, 863 (D.C. 2022) (quoting *Hilliard v. United States*, 879 A.2d 669, 671 (D.C. 2005)).

The trial court did not abuse its discretion in denying Mr. Sanders's request for an evidentiary hearing.  In his Section 23-110 motion, Mr. Sanders contends that an evidentiary hearing is presumptively required where the claim of ineffectiveness is based, in large part, on facts outside of the trial record.  According to Mr. Sanders, allegations of ineffectiveness relate to facts outside of the trial record where "the defendant challenges counsel's failure to call a witness."  As explained *supra*, however, Mr. Sanders does not present facts that could entitle him to relief in any regard.  *See Bellinger*, 127 A.3d at 515; *Barrie*, 279 A.3d at 863.  We therefore affirm the trial court's denial of Mr. Sanders's request for an evidentiary hearing.

## C.    Sufficiency of Evidence—Constructive Possession

On appeal, Mr. Sanders argues that the trial court erred in denying his motion for judgment of acquittal.  He contends that the government's evidence was

insufficient to prove constructive possession of the contraband. We disagree and affirm the trial court's denial.

### 1. Analysis

When reviewing a challenge to the sufficiency of the evidence, "we 'view the evidence in the light most favorable to the government, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence.'" *(Dominic) White v. United States*, 207 A.3d 580, 587 (D.C. 2019) (quoting *Cherry v. District of Columbia*, 164 A.3d 922, 929 (D.C. 2017)). "The evidence is sufficient if any rational fact-finder could have found the elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

When reviewing a sufficiency of the evidence claim, however, a court must consider all of the evidence, including that which is favorable to the defendant. *Schools v. United States*, 84 A.3d 503, 508 (D.C. 2013) ("The standard is not so strict that the defendant's evidence must be disregarded." (quoting *United States v. Beck*, 615 F.2d 441, 448 (7th Cir. 1980))). Although the factfinder "is entitled to draw a vast range of reasonable inferences from evidence, it may not base a verdict on mere speculation." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) (internal quotation marks and brackets omitted). The evidence "must be

strong enough that a jury behaving rationally really could find it persuasive beyond a reasonable doubt." *Id.* We therefore abide by the reasonable-doubt standard of proof, in which the factfinder must "reach a subjective state of near certitude of the guilt of the accused." *Id*. at 133 (internal quotation marks omitted).

To establish constructive possession, the government must prove beyond a reasonable doubt that the accused (1) knew that the contraband was present, and (2) had the ability and intent to exercise dominion or control over the contraband. *(Carlos) Johnson v. United States*, 290 A.3d 500, 516 (D.C. 2023) (citing *Moore v. United States*, 927 A.2d 1040, 1050 (D.C. 2007)). "Constructive possession may be sole or joint and may be proven by direct or circumstantial evidence." *Bruce v. United States*, 305 A.3d 381, 393 (D.C. 2023) (quoting *Rivas*, 783 A.2d at 129). "Ultimately, whether constructive possession has been proved beyond a reasonable doubt in any given case depends on a fact-specific inquiry into all of the circumstances." *(Tamara) Smith v. United States*, 55 A.3d 884, 887 (D.C. 2012) (brackets omitted) (quoting *James v. United States*, 39 A.3d 1262, 1269 (D.C. 2012)).

This court has established that, as a general matter, knowledge of and proximity to contraband are insufficient to establish the intent necessary to prove constructive possession. *Lesher v. United States*, 149 A.3d 519, 524 (D.C. 2016)

(citing *Rivas*, 783 A.2d at 130). Instead, there must be an additional probative factor, in addition to knowledge and proximity, that establishes that the accused was not a mere bystander and intended to exercise dominion or control over the contraband. *Id.*; *James*, 39 A.3d at 1269. Evidence goes beyond mere proximity when the area in which the contraband is discovered, such as a vehicle or living space, is owned by the accused. *See, e.g., (Tamara) Smith*, 55 A.3d at 887 ("It is usually easy to establish that the owner of a car or the occupant of a living area has constructive possession of illicit items recovered from these places." (quoting *Taylor v. United States*, 662 A.2d 1368, 1373 (D.C. 1995))); *Lesher*, 149 A.3d at 524. Notwithstanding a defendant's ownership of a vehicle in which contraband is found, however, the government must still establish that the defendant had knowledge of the contraband's existence. *See, e.g., James*, 39 A.3d at 1270-71 (holding evidence was insufficient to establish appellant's knowledge of drugs located in his vehicle because the drugs were not in plain view and there was no evidence that he was in the same neighborhood as the vehicle when the drugs were known to be in his vehicle).

Further, "[a]ny inference of knowledge that might have been drawn from [the accused]'s occupancy" of an area in which the contraband is found is weakened when the accused "shared . . . or had given or yielded access" to others. *Schools*, 84 A.3d at 509 (citing *In re R.G.*, 917 A.2d 643, 649 (D.C. 2007) ("[W]hen two or more

people are occupying a place, a defendant's control over the place is not by itself enough to establish constructive possession of contraband found there.")) (internal quotation marks omitted).  On the other hand, "[w]e have often found that evidence [is] sufficient to [prove] a defendant's constructive possession of contraband where the contraband was recovered in proximity to the defendant's personal items such as mail or personal papers, photographs, and identification cards." *Id.* at 510.

Here, a rational jury could find that the government proved beyond a reasonable doubt that Mr. Sanders constructively possessed the gun, drugs, and drug paraphernalia found in his vehicle's trunk.  As the parties stipulated at trial, Mr. Sanders was the owner of the vehicle in which the contraband was discovered. To be sure, ownership of the vehicle, by itself, is not necessarily dispositive of an individual's ability and intent to exercise dominion or control over the contraband. *See James*, 39 A.3d at 1271.  Mr. Sanders's ownership of the vehicle, however, is not the only piece of relevant evidence regarding his ability and intent to exercise dominion or control over the contraband.  For example, he was in near proximity to his car at a time when (1) he had the key fob on his person, and (2) the contraband was located in the car.[12]  This case is therefore distinguishable from *James*, in which

---

[12] Mr. Sanders also told the police that he drove the car to Mr. Stanley's apartment prior to the execution of the search warrant.  As discussed, however, this statement should have been suppressed. *See supra* at 11-19.

we ruled that the government failed to establish the appellant's knowledge of the drugs in his car because there was "no evidence in the record showing [the appellant]'s proximity to the car at a time when drugs were known to be in his [car]." *Id.* at 1271.

Additionally, and importantly, the contraband was located in a car that also contained Mr. Sanders's personal belongings, such as his clothes, trash, mail addressed to him, and a pill bottle with his name on it. Although the contraband was not in plain view—the drugs were located in a backpack inside of the car's trunk, the plastic baggies were located under the spare tire, and the gun was located under Mr. Sanders's assorted personal items—this court has previously held that evidence may establish constructive possession where the contraband was found among the accused's personal items even though it was not in plain view.

For instance, in *(Tamara) Smith*, we affirmed a constructive possession conviction when officers found a backpack containing weapons and ammunition on the floor of an apartment that the appellant shared with her boyfriend. 55 A.3d at 885-86. In the area near the backpack, police found a photograph of the appellant, the appellant's identification cards, and other contraband. *Id.* at 885-86, 890. Further, the appellant was present when the officers entered the apartment, which "indicat[ed] that [the] appellant was in close proximity to the contraband prior to the

search." *Id.* at 888. All of these facts led to this court's conclusion that a reasonable jury could infer that the appellant had both knowledge and intent to exercise control of the backpack and its contents. *Id.* at 888-90. Similarly, in *Ramirez v. United States*, 49 A.3d 1246 (D.C. 2012), we upheld the appellant's conviction based on constructive possession of narcotics when the appellant acknowledged that he resided in the apartment being searched and police found mail addressed to him and photographs of him in the same closet where they found the narcotics. *Id.* at 1250.

In light of these precedents, we conclude that a rational jury could conclude that Mr. Sanders had knowledge of the contraband and intent to control it. Mr. Sanders owned the car containing the contraband, was in close proximity to the car when the contraband was in the car, and had various personal belongings interspersed with the contraband. Moreover, as Mr. Sanders appears to concede, there is strong evidence of his ability to exercise dominion or control over the contraband because he possessed his car keys at a time when (1) he was in close proximity to his car, and (2) the contraband was located in the car. We therefore conclude that the evidence was sufficient for a rational jury to find beyond a reasonable doubt that Mr. Sanders was guilty of constructive possession of the contraband.

To be sure, our holding in *(Tamara) Smith* was based in part on the fact that evidence showed that the appellant "was the *sole occupant* of [that] bedroom for the week prior to execution of the search warrant." 55 A.3d at 889 (emphasis added). Here, there is evidence—Mr. Stanley's testimony at trial—that Mr. Stanley used the car to purchase and sell drugs and that the contraband belonged to him rather than Mr. Sanders. The jury, however, is entitled to disbelieve and discredit any part, or all, of Mr. Stanley's testimony because the jury has full discretion to make credibility determinations. *See (Steven) Robinson v. United States*, 928 A.2d 717, 727 (D.C. 2007) ("[T]his court is not in a position to substitute its judgment for that of the fact-finder when it comes to assessing the credibility of a witness."); *see also Bouknight v. United States*, 867 A.2d 245, 251 (D.C. 2005) ("The determination of credibility is for the finder of fact, and is entitled to substantial deference.").

Indeed, the jury had good reason to discredit Mr. Stanley's testimony, as it was filled with inconsistencies and contradictions. For instance, Mr. Stanley initially claimed he did not bring any baggies into Mr. Sanders's car. Upon further questioning, however, Mr. Stanley claimed that "actually, what happened" was that he had previously used Mr. Sanders's car to purchase the baggies and forgot them in the trunk. Mr. Stanley also initially claimed that he put the key in the ignition and turned it to start the car but later conceded that the car was actually a push-to-start vehicle. Moreover, as the trial court noted, the jury was permitted to find that

Mr. Stanley was biased through his personal relationship with Mr. Sanders and the fact that he had been made privy to discovery in this case. In light of the deference owed to the jury with respect to credibility determinations and the government's impeachment of Mr. Stanley's testimony, we conclude that Mr. Sanders has failed to establish that a reasonable jury could not find that the government established beyond a reasonable doubt all elements of constructive possession.

Mr. Sanders relies heavily on *Schools* and *Rivas*, but both cases are distinguishable. In *Schools*, this court held that the evidence was insufficient to support convictions for constructive possession of a firearm and ammunition when the firearm was found hidden beneath clothing in the dresser drawer in the back bedroom of an apartment that the appellant occupied. 84 A.3d at 505-07. In ruling that the government failed to establish the appellant's knowledge or intent, this court relied on the fact that "there was no evidence that any mail or papers, photographs, wallet, identification cards, or any other personal effects linked to appellant were found in the back bedroom where the gun and ammunition were found." *Id.* at 510. Here, on the other hand, Mr. Sanders's personal belongings were interspersed with the contraband in his car. Moreover, the evidence in *Schools* included videotapes showing that multiple individuals were present in the apartment on the day that the contraband was found. *Id.* at 509. Here, there is no evidence other than

Mr. Stanley's testimony to rebut the evidence directly connecting Mr. Sanders to the contraband found in his car.

To be sure, we stated in *Schools* that our holding was "inform[ed]" by uncontradicted testimony from the mother of the appellant's daughter. *Id.* at 507, 509. We made clear, however, that our holding was based on evidence wholly independent from that witness' testimony. *Id.* at 509 (noting that "for purposes of our analysis, we may not presume that [the jury] believed" the defense witness' testimony). Indeed, unlike in *Schools*, here the *only* evidence contradicting the government's evidence is Mr. Stanley's testimony. Accordingly, we conclude that our statement in dicta in *Schools* does not compel us to credit any of Mr. Stanley's testimony.

In *Rivas*, we reversed the appellant's conviction when he was the passenger in a vehicle in which drugs were found in the front console. 783 A.2d at 128-29. *Rivas* is easily distinguishable from this case. Although we determined in *Rivas* that the appellant was in close proximity to the drugs and that he had knowledge of its presence, we concluded that there was insufficient evidence that he harbored the requisite intent to possess the drugs rather than being a "mere bystander" who was in "the wrong place at the wrong time." *Id.* at 134-38. Unlike in *Rivas*, here, Mr. Sanders owned the car in which the contraband was found, and the contraband

was interspersed with his personal belongings throughout the car. *Rivas* is therefore distinguishable from this case and does not support Mr. Sanders's argument.

Accordingly, we affirm the trial court's denial of Mr. Sanders's motion for judgment of acquittal.

### III.    Conclusion

For the foregoing reasons, we affirm Mr. Sanders's convictions and the trial court's denial of Mr. Sanders's Section 23-110 motion.

*So ordered.*